# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
July 9, 2026
Lyle W. Cayce
Clerk

No. 25-20383

MIA SEARLES, *administrator of* THE ESTATE OF JALEN RANDLE; TIFFANY RACHAL; WARREN RANDLE; S.S., *Minor*,

*Plaintiffs—Appellants*,

*versus*

CITY OF HOUSTON; TROY FINNER, *Chief of Police, Houston Police Department*; JOHN DOES 1-10; SHANE C. PRIVETTE, *Officer, Houston Police Department*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:24-CV-1534

Before RICHMAN, HIGGINSON, and DOUGLAS, *Circuit Judges*.

STEPHEN A. HIGGINSON, *Circuit Judge*:

As with many tragic encounters between law enforcement and civilians, events unfold quickly. But no matter the pace of time, a life was lost. Our court must adjudicate whether daylight exists between the officer's actions and the reasonableness of said actions under the law at the time.

This appeal arises from a fatal encounter between Jalen Randle and Houston police officers. Police pursued Randle via car in order to execute

felony warrants out for his arrest. Following the pursuit, Randle exited and then returned to retrieve an object. One of the officers yelled, "Show me your hands." Before the sentence was finished, the officer fatally shot Randle.

Plaintiffs-Appellants,[1] who are Randle's family and his estate (collectively, "plaintiffs"), brought claims against various parties involved in the fatal shooting, including: (1) excessive force against Defendant-Appellee Officer Shane Privette, (2) supervisory liability against Defendant-Appellee former Houston Police Chief Troy Finner, and (3) a *Monell* claim against Defendant-Appellee City of Houston. The district court granted summary judgment for Privette on the grounds that his actions did not violate the Fourth Amendment because they were objectively reasonable and that Privette is entitled to qualified immunity because there was no clearly established law at the time prohibiting his conduct. Plaintiffs appeal the grant of summary judgment for Privette on both grounds.

We take seriously the tragedy that occurred. However, bound by our qualified immunity precedent, we affirm the district court on the basis that there is no clearly established law.

I.

A brief summary of the tragic sequence of events is as follows, drawing on the summary judgment record evidence that includes Privette's body-worn camera footage and his deposition. On April 27, 2022, the Houston Police Department conducted "an operation to find and arrest Jalen Randle" to execute three felony warrants stemming from an incident that occurred the month before: aggravated assault of a family member, being a felon in possession of a firearm, and evading arrest in a motor vehicle. The team

[1] Mia Searles filed the present suit as the administrator of the estate of Randle, Tiffany Rachel, Warren Randle, and S.S., a minor.

included Privette. The events leading up to the moment of the fatal encounter are not disputed by the parties. The officers saw Randle get into the passenger side of a Chevy Equinox and proceeded to pursue the car, ultimately engaging immobilization techniques that caused the Chevy to stop. After Randle got out of the passenger side of the Chevy, he turned back and retrieved a closed bag from the car. The critical moments ensued in a matter of seconds after this.

Privette's body-worn camera footage objectively illuminates the pace of the exchange and sequence of events that followed, although most of the critical images are obstructed by Privette's arms, when holding his firearm extended. The footage is of the interior of the police car until Privette exits. As he exits, over the course of one second, Privette draws his firearm. Docket Entry No. 61-8 (video) at 3:27–3:28. In a matter of one to two seconds after that, Privette issues the command to Randle, who can be seen turning, and Privette fires a single shot, fatally striking Randle's neck on the left side and causing him to fall to the curb instantly. *Id*. at 3:29–3:30. The shot was fired before Privette finished uttering the word "*hands*." *Id.* Privette exclaims, "Oh shit," and goes towards Randle with his gun drawn. *Id.* at 3:30–3:34. The footage shows a gray bag on the ground near Randle, which the officers later confirmed to contain a firearm. *Id.* at 3:56–4:01. The officers handcuffed Randle and then administered medical aid on site. *Id.* at 3:56–5:32**.** Randle was rushed to the hospital, where he was pronounced dead.

In light of the obstruction of the footage, however, additional information was adduced from Privette's account of the events in his deposition, though the characterization of the events is disputed by plaintiffs. Privette testified that he saw Randle attempt to flee but turn back toward the Chevy and retrieve something from the passenger side. He testified that he issued the verbal command, "Let me see your hands," because he could see Randle coming out of the car but could not yet see what was in his hands.

Additionally, Privette testified that Randle "turned towards" him and Officer Mansker, which is when Privette saw that Randle held a "dark-colored object" at his waist that Privette believed was a firearm.

Plaintiffs brought this claim on behalf of the Randle family on April 25, 2024. Privette as well as the other defendants each filed a motion to dismiss. Following an initial conference and motions hearing, the district court converted the motions to dismiss into motions for summary judgment to enable the court to evaluate the proffered exhibits and conduct limited discovery as to Privette's qualified immunity.[2] Upon completion of the limited discovery, Privette moved for summary judgment on the basis that he is entitled to qualified immunity as a matter of law. The district court granted Privette's motion for summary judgment.

## II.

"We review a grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Ratliff v. Aransas County*, 948 F.3d 281, 287 (5th Cir. 2020) (quoting *Gonzalez v. Huerta*, 826 F.3d 854, 856 (5th Cir. 2016)) (emphasis omitted). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Thus, absent proof, we do not "assume

[2] The district court converted the motions via a minute entry following the conference. However, we note that the only motion for summary judgment that was subsequently filed, and granted, was by Privette, and we make no determination with respect to the other defendants.

that the nonmoving party could or would prove the necessary facts" to survive summary judgment. *Id.* (emphasis omitted).

## III.

"The qualified immunity defense has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citation omitted). On appeal, plaintiffs challenge the district court's determination that Privette is entitled to qualified immunity on both prongs, contending that Privette's use of deadly force was excessive and unreasonable under the circumstances in violation of Randle's Fourth Amendment rights and that it violated clearly established law.

In this summary judgment posture, the "plaintiff has the burden to negate the assertion of qualified immunity once properly raised" by the defendant. *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). But, as our court has seen time and again, "[t]his is a demanding standard" for plaintiffs. *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). "Because qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law,' we do not deny its protection unless existing precedent places the constitutional question 'beyond debate.'" *Id.* (first quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986); and then quoting *Morgan v. Swanson,* 659 F.3d 359, 371 (5th Cir. 2011) (en banc)).

In particular, plaintiffs "must rebut the [qualified immunity] defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown*, 623 F.3d at 253. The district court thoroughly covered the issues in this case, finding no genuine dispute of material fact under either qualified immunity prong. We do not rehash Judge Rosenthal's extensive discussion, nor do we address

both qualified immunity prongs because "we can rely on either or both." *Hoke v. Anderson*, 799 F. App'x 224, 226 (5th Cir. 2020) (citing *Brown*, 623 F.3d at 253). As discussed below, we resolve the appeal on the basis of whether Randle's right was clearly established at the time of the alleged misconduct.

A.

As the Supreme Court cautioned in *Camreta v. Greene*, courts may begin with the first prong when it would prove "beneficial to clarify the legal standards governing public officials"; otherwise, the analysis may rest on other non-constitutional grounds. 563 U.S. 692, 707 (2011).

"Because it resolves the case, we begin and end with step two: was the alleged right clearly established at the time of the shooting?" *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020); *see also Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021) ("We resolve the appeal of [plaintiff's] excessive-force claim on whether the right she claims was clearly established at the time of the alleged misconduct."). But, before turning to the clearly established analysis, we elucidate why we choose to do so here.

In the context of claims of excessive force, the Supreme Court has underscored that this "is an area of the law 'in which the result depends very much on the facts of each case.'" *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)); s*ee also Lombardo v. City of St. Louis*, 38 F.4th 684, 690 (8th Cir. 2022) ("Given the intensive factual nature of this case, and the longstanding principle of judicial restraint . . . that courts avoid reaching constitutional questions in advance of the necessity of deciding them, we consider only whether the right was clearly established because it is dispositive to this appeal." (internal quotation marks omitted)); *O'Doan v. Sanford*, 991 F.3d 1027, 1036–37 (9th Cir. 2021). That difficulty is inherent to these claims and

therefore not necessarily a reason to choose this analytical route; otherwise, qualified immunity doctrine could stagnate.

We resolve this case under the clearly established prong because of the intensely factual circumstances, which do not meaningfully assist the growth of the law. As the district court recognized, the parties do not raise "much of a dispute" about the facts that unfolded prior to the moment of the shooting. Indeed, plaintiffs' challenge centers on the reasonableness of Privette's perception of Randle as an imminent threat and of the lack of time to comply with the warning. The tragic moments unfolded in a matter of mere seconds, and plaintiffs assert that jurors could reasonably interpret these moments differently than the district court. While possible, we remain mindful that our summary judgment review only resolves these differences in favor of the nonmoving party "when there is an actual controversy, that is, when both parties have submitted *evidence* of contradictory facts." *Little*, 37 F.3d at 1075 (emphasis added).

We do not discount the difficulty of the question—and the weight of the answer—under the first prong. But because of the split-second encounter and with the only record evidence being the officer's deposition and his obstructed, body-worn camera footage, we anchor instead on the second prong.

B.

Clearly established law is a "demanding standard," and we reiterate that it protects "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Malley,* 475 U.S. at 341). Because of the fact-intensive nature of excessive force claims, the Supreme Court has affirmed that "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 584 U.S. at 104

(quoting *Mullenix*, 577 U.S. at 13); *see also Nerio v. Evans,* 974 F.3d 571, 575 (5th Cir. 2020) (describing that, in order to surmount a qualified immunity defense, plaintiffs must be able to provide a case with "analogous or near-analogous facts"). Moreover, our court has held that we "cannot deny qualified immunity without identifying a case in which an officer acting under similar circumstances was held to have violated the Fourth Amendment, and without explaining why the case clearly proscribed the conduct of that individual officer." *Joseph ex rel. Est. of Joseph v. Bartlett,* 981 F.3d 319, 345 (5th Cir. 2020).

In measuring whether law was clearly established, we must first "frame the constitutional question with specificity and granularity." *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019). Plaintiffs frame the issue as whether clearly established law prohibited Privette from "fir[ing] without warning upon a non-threatening suspect who is attempting to run away." However, as our court held in *Garcia*, "[t]hat high level of generality cannot clearly establish the relevant law." 957 F.3d at 601 (reasoning that plaintiffs did not meet their burden by arguing that Garcia had a clearly established right "to be free from deadly force where he was not attempting to flee and did not pose an immediate threat to the officers, nor anyone else").

The district court, instead, defined the circumstances for comparison with greater precision:

> [W]hether, in April 2022, it was clearly established that a police officer violates the Fourth Amendment by using deadly force against a suspect, when: that suspect is a convicted felon with a history of illegally possessing firearms; has three active felony warrants; the suspect was fleeing from the police, then turns back to reach into the vehicle he has just exited to retrieve an unidentified object from the front passenger side; the suspect then turns to face the officers, holding the object in front of him; one of the officers orders the suspect to show his

> hands; and that officer shoots the suspect without giving him adequate time to comply with the order.

The appropriate factual comparison lies somewhere in between these summaries. Taking the district court's comprehensive encapsulation, we modify it slightly to capture that the suspect had *some* active felony warrants out for his arrest, but we are not exacting on the number. Moreover, we modify one aspect to make inferences in favor of the nonmoving party: we consider that the suspect was turning, perhaps to flee, not necessarily with intent to face the officers.

Thus, in order to prevail on this prong, plaintiffs must provide supporting caselaw that is "factually similar enough to the situation [Privette] faced to have placed the lawfulness of his actions beyond debate." *Baker v. Coburn*, 68 F.4th 240, 246 (5th Cir. 2023), *as revised* (May 19, 2023). "In other words, controlling authority or a robust consensus of persuasive authority must have placed the question 'beyond debate,' with 'the right's contours . . . sufficiently definite that any reasonable official in the [officer's] shoes would have understood that he was violating it.'" *Id.* at 245–46 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

As plaintiffs bear the burden of establishing whether there is a dispute of material fact, we turn to the authorities plaintiffs rely on. Plaintiffs principally rely on three cases.[3] But, the cases are factually distinguishable in key ways, rendering them inapt to provide notice of clearly established law.

First, plaintiffs anchor on *Baker v. Putnal*, where our court reversed a grant of summary judgment to the officer on qualified immunity grounds. 75

---

[3] The district court recognized the imperative of considering each parties' best cases, especially as pertains to a legal issue that is continuously evolving, and invited the parties to submit supplemental briefing to that effect. Docket Entry No. 77.

F.3d 190, 198 (5th Cir. 1996). *Baker* shares certain facts in common with this case, including an officer who operated off a *belief* that the decedent was armed. *See id.* In *Baker*, the parties disputed whether the officer gave the decedent a warning. *Id.* Moreover, our court recognized there were numerous factual disputes in *Baker* and resolved them in favor of the decedent, finding that the "only uncontroverted evidence" was that there was chaos in the surrounding scene and the decedent "at least began to face [the officer]," yet these facts alone did not constitute "compelling reasons to find that [the officer's] use of force was not excessive as a matter of law." *Id.*

Unlike in *Baker*, it is undisputed that Privette attempted to warn Randle prior to firing his weapon. But, from the body-worn camera footage alone, it is also undisputed that Randle had no time to comply with Privette's warning, rendering it effectively null. Yet, for the reasons discussed below, this similarity is divorced from the broader context of how the circumstances unfolded. Additionally, and relevant here, plaintiffs *do* dispute the characterization of Randle's turn, which was the critical moment that seemingly precipitated Privette's shot. Plaintiffs argue that Randle was turning to flee rather than turning to actively face the officers as part of any furtive or aggressive gesture, likening the facts of this case to *Baker* in support of their argument.

Despite similarities, there are critical facts distinguishing *Baker* from the present case. First, and most probative, the plaintiffs in *Baker* contended whether the decedent was unarmed during the encounter and provided "sworn testimony of three witnesses" who stated that he "took no threatening action toward" the officer. *Id.* In contrast, the parties here do not dispute that Randle held *an* object by his waist, one that he had just retrieved from the car. Thus, aside from Privette's body-worn camera footage,

plaintiffs fall short of providing competent summary judgment evidence to refute the reasonableness of Privette's perception that Randle was armed.[4]

Further, in *Baker*, our court gave considerable attention to "[t]he number of shots and the nature of the wounds," which raised "a serious question as to the reasonableness of [the officer's] conduct." *Id.* Namely, the wounds indicated that the decedent was shot from behind, when he was not facing the officer, therefore calling into question the reasonableness of the use of deadly force. *Id.* However, based on where Randle was shot, he was not facing away from Privette; thus, the same issue is not the relevant stopping point. Moreover, there are discrepancies between the officers' knowledge of the decedent at the time. In *Baker*, the officer had little information and no prior interaction with the decedent, whereas here, Privette operated with knowledge of Randle's warrants, believing that Randle was likely armed.

Accordingly, "because the circumstances of the instant case are materially different" than in *Baker*, "we cannot conclude that the established law, in that case, would have put [Privette] on notice that his conduct was clearly unlawful." *Coburn*, 68 F.4th at 246.

Plaintiffs also cite to *Cole v. Carson*, a case that concerned a suicidal teenager who was confronted and fatally shot by officers in the woods. 935 F.3d 444, 454–55 (5th Cir. 2019) (en banc). As our court has since explained, the officer violated clearly established law at the time by shooting the teenager, "who—though pointing a gun at his own head—made no

---

[4] Plaintiffs submitted an expert report in its Response in Opposition to Privette's Motion for Summary Judgment. Privette moved to exclude this report, and the district court denied his motion, stating in conference that it would be afforded "little weight." On appeal, plaintiffs make only passing references to the report, thus we similarly afford it little weight.

threatening movements toward the officers, was facing away from the officers, was not warned by the officers even though there was opportunity to do so, and may have been unaware of the officers' presence." *Garcia*, 957 F.3d at 601 (citing *Cole*, 935 F.3d at 454–55).

The facts here are distinct. Following the car pursuit, Randle was aware of the surrounding police presence, and as stated above, Randle was not shot from behind. Notably, unlike the suicidal teenager in *Cole* with no prior convictions or warrants, who did not pose an immediate threat to others except himself, Randle was a convicted felon with outstanding (and firearm-related) warrants, which influenced Privette's perception. *See Cole*, 935 F.3d at 455.

Similarly, plaintiffs' citation to *Poole v. City of Shreveport* is unavailing. 13 F.4th 420, 422, 425 (5th Cir. 2021). There, the circumstances involved an encounter with an individual experiencing a mental-health crisis, and our court affirmed the district court's denial of qualified immunity for the officer. *Id*. at 422. In *Poole*, the plaintiff disputed the critical fact of whether the individual was "visibly unarmed." *Id.* at 425. After confirming he was, in fact, unarmed on the officer's body-worn camera footage, we concluded that a jury could find in favor of the plaintiff on this fact. *Id.* at 426.

For that reason alone, this case is distinguishable, because again, the dispute does not center on whether or not Randle held an object at all. *See id.* at 425 (emphasizing the importance of determining if Poole was clearly unarmed because that is distinct from "'furtive gesture' cases in which the officer could reasonably fear that the suspect was about to pull a gun from a waistband or other hidden location"). As discussed above, for similar reasons plaintiffs' comparison to *Baker* falters. Plaintiffs are unable to refute whether Randle held an object nor whether that object could be viewed as a firearm.

Moreover, as the district court aptly pointed out, "unlike Randle, Poole had no known criminal history or a history of possessing a weapon, and he was not wanted for offenses involving violence. Poole was apprehended solely because the police saw him driving erratically and pursued him." We agree, finding *Poole* readily distinguishable.

* * *

For the foregoing reasons, because plaintiffs have not raised authority that clearly establishes that Privette's use of lethal force violated the law under the circumstances he was facing, plaintiffs also fall short of their burden to prove that Privette is not entitled to qualified immunity.

IV.

As often recognized, the ultimate touchstone of Fourth Amendment excessive force claims is "reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). It bears repeating, though, that judicial review of 'reasonableness' is firmly rooted in a singular perspective: that of what an officer would reasonably know, believe, and do in similar circumstances. Officers are unquestionably placed in difficult situations. As evident in this case, they "make split-second decisions," and are entrusted with the essential duty of doing so to protect public safety. *Harmon v. City of Arlington*, 16 F.4th 1159, 1166 (5th Cir. 2021).

On the other hand, too often there is little that is reasonable for the individuals on the fatal receiving end of these encounters, especially for their families who are left behind. With no instructions to stay in the vehicle, no opportunity to combat the preconception that he was a violent threat on the basis of warrants out for his arrest, and no time to comply with the command that registered in his ears simultaneously with the fatal shot that lodged in his neck, this tragic circumstance exposes that reality.

But the strictures of qualified immunity and binding caselaw remain. And it is for these reasons, we AFFIRM.